## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br><br>v. )<br><br>SUNOCO, INC., et al., )<br><br>Defendants. ) | Civil Action No. 05-6336-ABB |

### Opinion

August 8, 2007                                                    Anita B. Brody, J.

#### I.  Introduction

The United States has filed suit against defendants Atlantic Richfield Company et al. ("AR") and Sunoco et al. under the Pennsylvania Storage Tank and Spill Prevention Act, 35 Pa. C. S. § 6021.101, et seq., ("Tank Act"), the Pennsylvania Uniform Contribution Among Tortfeasors Act, 42 Pa. C. S. §§ 8321-8327 ("UCATA"), and the federal Declaratory Judgment Act, 28 U.S.C. § 2201(a).  The United States also makes a claim against Sunoco only under the Clean Streams Act, 35 Pa. Stat. § 691.401 ("CSA").  In this opinion, I address defendants' separate motions for summary judgment on the Tank Act, UCATA, and Declaratory Judgment Act claims; as well as Sunoco's motion for summary judgment on the CSA claim and AR's motion to strike the United States's request for a jury trial.[1]

---

[1] I previously denied without prejudice (doc. # 104) the United States's motion for partial summary judgment on the defendants' res judicata affirmative defenses, and denied in part and granted in part (doc. # 107) the United States's and AR's cross motions for partial summary judgment on the statute of limitation.

The suit concerns petroleum pollution ("the Plume") allegedly emanating from a section of a South Philadelphia refinery known as the Point Breeze Processing Area. ¶ 8.[2]   Point Breeze is currently owned by defendant Sunoco and was previously owned by defendant AR. ¶ 4, ¶ 9.   The Plume migrated underground from Point Breeze and contaminated a nearby United States property called the Defense Supply Center Philadelphia ("DSCP property"). ¶ 11-14; 17-44. Pollution is still migrating from Point Breeze to the DSCP property. ¶ 47.

The United States detected the Plume in 1987 on its own property and notified the predecessor agency of the Pennsylvania Department of Environmental Protection (PADEP) of violations of state environmental regulations. ¶ 17.  The United States first thought that the Plume came from a leaking fuel line of its own, but came to believe that the Plume originated mostly from Point Breeze. ¶ 17-44. Less than 5% of the total pollution is attributable to the United States. ¶ 91.  In 1996, the United States and defendant Sunoco entered into a Consent Order and Agreement ("The 1996 COA") with PADEP to remediate the Plume together. ¶ 31.[3] However, this agreement broke down, and in 1999 PADEP issued a Unilateral Administrative Order ("The 1999 UAO") requiring the United States to assume sole responsibility for the remediation. ¶ 40, U.S. Ex. 13.[4] PADEP deemed the United States liable and ordered it to remediate the Plume alone. ¶ 40.  The UAO was appealed by the United States to the Pennsylvania Environmental Hearing Board (EHB), which upheld the agency action. *Id.* The United States also sought review of the UAO in the Pennsylvania Commonwealth Court and the Eastern District of Pennsylvania. ¶ 42.  Those matters settled with an agreement that the United States and PADEP would resolve  future disagreements about the site through mutually agreeable dispute resolution. ¶ 42.  Pursuant to the UAO, the United States has been remediating the Plume and anticipates that future remediation will be required. ¶ 43-44.   It has already spent $22,000,000 on remediation. ¶ 75.

---

[2] All citations are to the original Complaint unless otherwise noted.

[3] The text of the 1996 COA is attached as Exhibit 1 to the United States's Motion for Partial Summary Judgment on Affirmative Defenses (docket entry # 43) but was not uploaded to ECF.

[4] The text of the 1999 UAO is included as Exhibit 13 to the United States's Motion for Partial Summary Judgment on Affirmative Defenses (docket entry # 43) but was not uploaded to ECF.

## II.    UCATA Claims

The Uniform Contribution Against Tortfeasors Act (UCATA), 42 Pa. C. S. §§ 8321-8327, gives a right of contribution to joint tortfeasors, defined as "two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them." § 8322. The United States seeks contribution from Sunoco and AR to compensate for the funds it has expended to remediate their joint pollution. Both Sunoco and AR seek summary judgment on the UCATA claims.

### A.    Underlying Tort

The UCATA requires an underlying tort because it applies only to parties "liable in tort." 42 Pa. C. S. § 8322. The United States grounds its UCATA claim on its Tank Act liability to PADEP. US Opp. at 74 (docket entry # 64). Sunoco argues that a Tank Act violation cannot constitute a tort for UCATA purposes because it is a statutory violation, not a common law tort. AR, however, agrees that a Tank Act violation is "a type of tort claim" that may serve as a basis for a UCATA action. AR Reply at 43 n. 31 (docket entry # 79).

A violation of the Tank Act is defined in the Tank Act as a "public nuisance." 35 Pa. C. S. § 6021.1304. Violations of the Tank Act are also "abatable in the manner provided by law or equity for the abatement of public nuisances." § 6021.1305(a). "Public nuisance" is a kind of tort that may be statutorily codified and defined. W. Page Keeton, *Prosser and Keeton on Torts* § 90, at 646 (5th ed.). Further, Pennsylvania courts view public nuisances as a kind of tort. *See, e.g., Duquesne Light Co. v. Pennsylvania American Water Co.*, 850 A.2d 701, 705 (Pa.Super. 2004). Thus, the Pennsylvania legislature has deemed Tank Act violations to be a kind of tort, giving rise to liability under UCATA.

Sunoco has presented no Pennsylvania authority suggesting that a UCATA claim cannot be based on a violation of a statutorily-defined tort such as a Tank Act violation. Other states have held or suggested that certain statutory violations do not constitute torts under their joint tortfeasor contribution laws. *See, e.g., Vermont v. Thierrien*, 830 A.2d 28, 36 (Vt. 2003); *Hopkins v. Powers*, 497 N.E.2d 757, 759 (Ill. 1986). But in *Thierrien* and *Hopkins* the underlying statutory violations were apparently not defined as a "public nuisance" (or any other kind of tort) by the express language of the statute itself, as they are in the Pennsylvania Tank Act.

3

That the United States has argued at other points in this litigation that Tank Act violations are not torts for statutes of limitations purposes does not foreclose it from also arguing that its Tank Act liability is a tort for UCATA purposes.   The United States never argued that its own claim here is not a tort.   Instead, it argued that the statute of limitations analysis requires a holistic view of all possible kinds of liability under the Tank Act.   That argument does not now undermine the United States's position that the present, concrete Tank Act violation can be the basis for a UCATA claim.

C.      Joint Tortfeasor Status

The UCATA plaintiff and defendants must be "jointly or severally liable in tort for the same injury."   § 8322.   Sunoco argues that the United States has failed to allege in its complaint that either Sunoco or it itself is a tortfeasor, or that they acted jointly.   However, by making claims against Sunoco and AR for primary liability under the Tank Act and acknowledging that the United States itself contributed at least 5% of the pollution at the site, the United States has adequately pleaded that it and the defendants are joint tortfeasors under the UCATA.

Sunoco further argues that the United States and Sunoco are not joint tortfeasors under the UCATA because their contributions to the Plume were separate, not joint, torts.   Under Pennsylvania law, two actors are joint tortfeasors for UCATA purposes if their conduct "causes a single harm which cannot be apportioned ... even though [the actors] may have acted independently." *Rabatin v. Columbus Lines, Inc.,* 790 F.2d 22, 25 (3d Cir. 1986).   Pennsylvania also embraces the tort concept of "substantial factor" causation for joint tortfeasors – i.e., that joint tortfeasors may act independently and concurrently to create an enhanced injury. *Harsh v. Petroll,* 887 A.2d 209 (Pa. 2005)

An examination of Pennsylvania case law shows that in this case, the parties are joint tortfeasors.   In *Harsh,* a car crash case, the Pennsylvania Supreme Court held that the negligent driver and the manufacturer of the decedents' uncrashworthy car could be joint and severally liable to the plaintiff for the accident. 887 A.2d at 218-19.   In *Rabatin,* the manufacturer of defective equipment and the employer who failed to maintain the equipment were deemed joint tortfeasors under UCATA because they had caused a single injury when the equipment broke and harmed the plaintiff.   790 F.2d at 25-6.   In *Capone v. Donovan,* 480 A.2d 1249 (Pa. Super. 1984), a series of three doctors negligently treated Capone's broken arm.   Doctors Donovan and Stackowski took the initial x-rays and fitted the cast.   Some weeks later, when the arm had not

4

improved, Capone went to Dr. Persico, who performed more x-rays and wrapped the arm in an ace bandage. Ten months later when the arm still hadn't healed, Capone went to a fourth doctor who correctly diagnosed him and performed the needed surgery. Because of the delay, Capone was left permanently disabled. The Pennsylvania court ruled that all three doctors were joint tortfeasors because "the alleged malpractice of all treating physicians combined to produce a permanent injury" that could not be apportioned among the tortfeasors. *Id.* at 1251.

On the other hand, the courts have declined to find joint tortfeasor status where the tortious conduct is clearly independent and creates separable injuries. *See Lasprogata v. Qualls*, 397 A.2d 803 (Pa. Super. 1979); *Harka v. Nabati*, 487 A.2d 432 (Pa. Super. 1985); *Kemper National P & C Companies v. Smith*, 615 A.2d 372 (Pa. Super. 1992) and *Foulke v. Dugan*, 212 F.R.D. 265 (E.D.Pa. 2002) (Brody, J.). In *Lasprogata* the Superior Court held that a negligent driver causing the initial injury and a negligent physician aggravating the injury later on through malpractice are not joint tortfeasors under UCATA. 397 A.2d at 805. The court reasoned that

> The acts of the original wrongdoer and the negligent physician are severable as to time, neither having the opportunity to guard against the other's acts, and each breaching a different duty owed to the injured plaintiff. While they are two active tortfeasors, they are not actually acting "jointly" when using that term in the strict sense.

*Id.* at 805.

Similarly, in *Kemper*, the injured party suffered a disabling stroke as a result of negligent chiropractic treatment he received for injuries from a car accident. *Id.* at 373-74. The injured party sued the negligent driver who caused the accident. The driver's insurance company settled and in turn sought UCATA contribution from the chiropractor. But the Pennsylvania Superior Court denied the UCATA claim. *Id.* at 380. The Superior Court regarded the actions of the chiropractor and the driver to be too separate to give rise to joint tortfeasor status. *Harka* involved a similar set of facts and outcomes. 87 A.2d 432. *Foulke* arose when Budd's employee assaulted Foulke. 212 F.R.D. 265. Foulke hired attorney Dugan to bring a negligence action against Budd. Unhappy with attorney Dugan's work, Foulke filed a malpractice claim against him. The court ruled that a UCATA claim was not available between Dugan and Budd because they were not joint tortfeasors. *Id.* at 270-71.

This case is more like *Harsh, Capone* and *Rabatin* than *Lasparagota, Kemper, Harker* and *Foulke*. Here, the plaintiff has alleged that one tract of land was polluted by numerous

5

polluters who cumulatively added to a common, indivisible physical injury, as in *Capone* and *Rabatin*. Like *Capone* and *Harsh,* that the violations occurred sequentially rather than simultaneously does not bar joint tortfeasor status where the acts combined as substantial factors to form one physical injury. That the defendants here all violated the same duty under the Tank Act also supports their joint tortfeasor status.

> D.     Lack of Action under Federal Tort Claims Act

Sunoco argues that the United States cannot be a "joint tort-feasor" because it was never sued under the Federal Tort Claims Act (FTCA). Sunoco reasons that the United States can only be held liable for a tort if it waives its immunity under the FTCA, and unless the United States was actually sued for a tort under the FTCA, it cannot be a joint tortfeasor under the UCATA. But the FTCA only applies to torts for money damages. 28 U.S.C. § 1346(b). In this case, the United States was not sued for money damages. It was ordered to abate a public nuisance. This tort liability for causing a public nuisance that makes the United States a joint tortfeasor under UCATA.[5] The lack of an FTCA claim is irrelevant.

> E.     Settlement

AR argues that the United States has not met the UCATA requirement that AR's own liability for the joint tort be extinguished by the United States's settlement with the injured party. The UCATA does not require a settlement, but specifies that a joint tortfeasor who "enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement." § 8324(c). The statute does not, however, precisely define the term "settlement."

AR says that the 1996 Consent Order and Agreement between the United States and PADEP was a "settlement" under the UCATA, but that it failed to extinguish AR's own liability as required for UCATA liability. The United States counters that the 1996 COA was not a "settlement" under the UCATA. Under the 1996 COA, the U.S. and Sunoco agreed to jointly and cooperatively remediate the pollution. 1996 COA, ¶¶ 4-5. According to the United States, cooperation between the United States and Sunoco broke down, and so in 1999 PADEP replaced the 1996 COA with the 1999 UAO ("Unilateral Administrative Order") compelling the United

---

[5] The United States waived immunity to the PADEP action under the Solid Waste Disposal Act, 42 U.S.C. § 6991f(a) and § 313 of the Clean Water Act.

States to assume full responsibility for remediation.  The United States characterizes the 1996

COA as an "interim accord" that did not constitute a settlement under the UCATA.

While there may be some question about whether the 1996 COA alone would be a

"settlement" under UCATA, that agreement is no longer in force.  AR does not dispute that the

United States's current obligations are governed by the 1999 UAO.  These current obligations,

not the past agreement, are relevant to the present UCATA claim.  Because the current 1999

UAO cannot be characterized as a settlement, AR's liability does not need to be extinguished

under UCATA § 8324(c).

III.     Tank Act Cost Recovery

A.     Statutory Structure

The United States has made cost recovery and diminution of property value claims under

the Tank Act against both Sunoco and AR.[6]  The Tank Act allows "any person having an interest

which is or may be affected" to file a suit to "compel compliance" with the Act.  35 Pa. C. S. §

6021.1305(c).  This express private right of action has been interpreted by the Pennsylvania

Supreme Court to include the right to cost recovery.  *See Centolanza v. Lehigh Valley Dairies,*

*Inc.*, 658 A.2d 336, 330-40 (Pa. 1995).  However, a private action may not be filed if

> the department has commenced and is diligently prosecuting a civil action in a
> court of the United States or of the Commonwealth or is in litigation before the
> Environmental Hearing Board to require the alleged violator to comply with this
> act or any rule, regulation, order or permit issued pursuant to this act.

§ 6021.1305(c).

The Tank Act places a rebuttable presumption of liability on any "person who owns or

operates " a storage tank for "all damages" resulting from pollution within 2500 feet of a storage

tank.  § 6021.1311(a).  The presumption may be overcome only by clear and convincing

evidence.  *Id.*  Private plaintiffs may use the presumption of liability.  *Centolanza,* 658 A.2d at

---

[6] Although I previously dismissed both Tank Act claims against AR as time-barred, this does not
necessarily extinguish the United States's right to collect against AR for contribution for Tank
Act violations.  A UCATA claim is viable even where the underlying tort claim would be barred
by the statute of limitations   *See Oviatt v. Automated Entrance System Co., Inc.*, 583 A.2d 1223,
1227 (Pa. Super. 1990).  *See also MetroHealth Medical Center v. Hoffmann-LaRoche, Inc.*, 685
N.E.2d 529, 532 (Ohio 1997).

7

341.   One Pennsylvania appellate court has held that the presumption of liability may only be used against current tank owners, not prior owners.  *See Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 658 (Pa. Super. 1999).

      B.     United States as Liable Party

     Sunoco and AR argue that because the United States is itself a liable party under the Tank Act, it is barred from using the Tank Act's private right of action.  The United States's own liability is undisputed.  Cmplt. ¶¶ 17, 19.  But there is no indication in the case law or statute that a liable party may not use the Tank Act to recover costs.  The Tank Act by its express terms extends a private right of action to "any person having an interest which is or may be affected" by a violation of the Act.  35 Pa. C. S. § 6021.1305(a).  Pennsylvania requires that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."  1 Pa. C. S. § 1921(b).  The broad language in the Tank Act language provides no basis for excluding a liable party from seeking any of the available remedies under the Tank Act against other liable parties, including cost recovery.  *Cf. Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 657 (Pa. Super. 1999) ("This section contains few limitations as to who may sue to compel compliance and recover response costs under the act, and the remainder of the act contains no additional limitations as to standing. ")

     In *Centolanza*, the leading Pennsylvania case on the Tank Act, the Pennsylvania Supreme Court held that the primary purpose of the Tank Act was "promoting the goal of prompt cleanup and removal of spills."  *Centolanza v. Lehigh Valley Dairies, Inc.*, 658 A.2d 336, 340 (Pa. 1995).  Sunoco and AR argue that allowing a liable party to recover costs would undermine this purpose.  But it is not apparent why this should necessarily be so.  Where, as here, a liable party believes itself to have had only a minimal role in causing the pollution, the prospect of recovering its costs could be incentive to perform prompt remediation of all the pollution.  For the same reasons, *Zeigler v. Lynn*, 33 Pa. D&C 4th 143 (Pa. Com. Pl. 1996) is not to the contrary.  In *Zeigler*, the Court of Common Pleas held that an owner of a storage tank could not use the Tank Act to recover costs from the operator of the same storage tank.  But this case presents very different facts:  two adjacent landowners with separate storage tanks with different levels of contribution to the pollution.  Allowing the minimally liable party to sue promotes cleanup.

     The Supreme Court's recent decision in *Atlantic Research* holding that CERCLA's cost recovery provision may be used by liable parties in some cases, is also persuasive support for the

conclusion that liable parties may seek cost recovery under the Tank Act. *See U.S. v. Atlantic Research Corp.*, 127 S. Ct. 2331, 2339 (U.S. 2007).

C. Implied Contribution

Sunoco and AR also argue that because the United States only seeks to recover a portion of the costs it has expended, it is actually making an implied contribution claim under the Tank Act, not a cost recovery claim. Defendants say that no such implied right of contribution exists in the Tank Act. But the United States characterizes the claim as Tank Act cost recovery, not implied contribution. U.S. Surreply at 4 (docket entry # 82). This characterization is evident on the face of the original complaint as well, which is for recovery of "costs" and seeks "all costs of abatement." Cmplt. ¶ 1, 78. The First Amended Complaint further clarifies that the United States seeks "response costs" under the Tank Act. Am. Cmplt. ¶ 1.

The defendants' re-characterization of the United States's claims as implied contribution rests on the United States's acknowledgement of its own liability for part of the pollution. Assuming that there is no right of implied contribution under the Tank Act, by the defendants' analysis all Tank Act cost recovery claims by liable parties who acknowledge their own liability would be barred. But as established above, the Tank Act gives liable parties the right to seek recovery. Defendants may not destroy that right by recharacterizing the claim as one for contribution. Cost recovery and contribution are two distinct remedies available to liable parties. *Cf. U.S. v. Atlantic Research Corp.*, 127 S.Ct. 2331, 2338 (U.S. 2007) (holding that both CERCLA's cost recovery and contribution provision are available to liable parties).[7]

D. Presumption of liability

The Tank Act is places a rebuttable presumption of liability on "a person who owns or operates" a storage tank for "all damages" resulting from pollution within 2500 feet of a storage tank. 35 Pa. C. S. § 6021.1311. Sunoco argues that the presumption of liability may not be used by a liable party. But language of the Tank Act provides no reason for preventing liable party who can use the Tank Act for a cost recovery claim from also using Tank Act's presumption of liability. Thus, the United States may benefit from the presumption.

---

[7] Cost recovery defendants, like Sunoco and AR, may file counterclaims against each other for UCATA contribution if they feel they should not be liable for the entire sum a liable plaintiff seeks to impose on them through cost recovery. *U.S. v. Atlantic Research Corp.*, 127 S.Ct. at 2339.

However, the United States may only exercise the presumption against the current owner, Sunoco, not against the former owner AR. In *Juniata*, the Superior Court held that the presumption of liability may not be used against a former owner:

> Section 1311 does not impose a presumption of liability against any "owner" or "operator," but limits the application of the statutory presumption to "a person who owns or operates' a storage tank." The legislature's use of the present tense connotes that the presumption applies only to current owners and operators of storage tanks.

*Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 658 (Pa. Super. 1999).

     E.     Pre-existing PADEP Enforcement

          1.     Background

In the 1999 UAO, PADEP deemed the United States liable for remediating the Plume at the DSCP site. Cmplt. ¶ 40. This final agency action was appealed by the United States to the Pennsylvania Environmental Hearing Board (EHB),[8] which upheld PADEP's order. *Id.* The parties have raised several interlocking issues relating to pre-existing PADEP action over the Plume.

          2.     Estoppel of Presumption of Liability

In the present motion, Sunoco argues that if the Tank Act claims may otherwise go forward, the United States is estopped from applying the Tank Act's presumption of liability against Sunoco because PADEP has already determined that the presumption should not apply to Sunoco. However, the defendants also raised broader affirmative defenses of res judicata in their Answers. The United States moved for partial summary judgment on the res judicata affirmative defenses in an earlier motion, which I denied without prejudice to renew at a later date. I will likewise reserve my decision on estoppel of the presumption of liability until later in the litigation, so that all the res judicata issues can be determined together after discovery.

          3.     Diligent Prosecution Bar

Sunoco argues that the Tank Act's diligent prosecution bar, 35 Pa. C. S. § 6021.1305(c), prevents the United States from proceeding because PADEP has taken action.

The diligent prosecution bar bars private rights of action if PADEP

---

[8] The Environmental Hearing Board (EHB) is an independent state administrative agency that formally adjudicates appeals from PADEP final actions. 35 Pa Stat. §§ 7511-7516.

has commenced and is diligently prosecuting a civil action in a court of the United States or of the Commonwealth or is in litigation before the Environmental Hearing Board to require the alleged violator to comply with [the Tank Act].

§ 6021.1305(c).

Sunoco argues that the diligent prosecution bar applies to United States because the matter has been litigated before the EHB.  But the bar does not apply here.  The statute speaks in the present and present perfect tense:  it only applies if PADEP "has commenced" and "is diligently prosecuting" a civil action in court; or if it "is in litigation" before the EHB.  § 6021.1205(c).  PADEP is not currently prosecuting any civil action in a court.  The matter was being litigated before the EHB, but that appeal reached a final judgment.  Thus, if PADEP's past actions are to foreclose the United State's present relief, it must be through res judicata (which I have already held will be adjudicated at a later date), not through the Tank Act's diligent prosecution bar.

### 4.     PADEP's Regulatory Actions Short of Full Litigation

Sunoco argues that under Pennsylvania case law, whenever PADEP has "acted" at all with respect to the pollution there can be no private right of action for cost recovery.  In essence, Sunoco argues that for cost recovery claims, the courts have created a much broader prosecution bar than the one set out expressly in the Tank Act and addressed above.  The express diligent prosecution bar applies only where PADEP is currently litigating in a court or before the EHB.  But Sunoco's proposed bar would extend to any agency corrective actions at all.  Because PADEP has taken some corrective action in this case, if Sunoco is correct then the United States has no cost recovery claim.

In *Centolanza*, the Pennsylvania Supreme Court held that "[p]rivate citizens may take action when DER *has failed to act*."  *Centolanza*, 658 A.2d at 340 (emphasis added).  According to Sunoco, this language means that whenever PADEP has taken *any* steps to clean up pollution, a private right of action is barred.  Sunoco reasons that the *Centolanza* court only allowed a remedy for cost recovery because PADEP had not taken any action, and that this means that any action by PADEP forecloses a private action for cost recovery.  But there is no basis to read *Centolanza* so narrowly.  The *Centolanza* court extended the class of remedies available to a private plaintiff by interpreting the Tank Act's express private right of action to include cost recovery.  *Id.* at 340.  The court's passing mention that PADEP "failed to act" in the case before it cannot be taken to mean that a private action for cost recovery is barred if PADEP has taken

11

*any* corrective action. Nothing in *Centolanza* suggests that the court meant to narrow the right to private cost recovery claims beyond the diligent prosecution bar already expressly established in the statute.[9]

## IV.    Retroactivity of the Tank Act (AR)

### A.    Introduction

AR argues that application of the Tank Act to its conduct would be impermissibly retroactive because it sold its interest in the refinery before the Tank Act's effective date. Although I have previously ruled that the Tank Act claims against AR are time barred, they may still provide the basis for a UCATA contribution claim by the United States as a join tortfeasor unless application of the Tank Act to AR would be impermissibly retroactive.

AR takes two tacks. First, it argues that applying the Tank Act to pollution resulting from a leak that happened before the 1989 effective date would be to apply the statute retroactively, because the conduct regulated by the statute (the leak, according to AR) happened before the effective date. Second, it argues that the definition of "owner" as one who owned a tank in 1984 is just a mistake and does constitute the legislature's express intent to apply the statute retroactively. But neither approach hits the mark.

### B.    Tank Act Applies to Condition of the Land at the Time of Enactment

Under the Tank Act, a party may sue "any owner" of a storage tank "alleged to be in violation" of the Act. 35 Pa. C. S. § 6021.1305(c). One court has held that this language prevents the Tank Act from operating retroactively to reach leaks that occurred before the effective date because one can not be "in violation" of the Tank Act until the Tank Act itself was

---

[9] *Ziegler v. Lynn*, 33 Pa. D. & C. 4th 143, 145 (1996), is distinguishable from this case. *Ziegler* concerned suits between tank owners and operators:

> We find that the Act does not address the situation of an owner suing an operator, or vice versa. Where the DER has already acted to address the problem, the purpose of the Act is served. It is not necessary to permit owners to sue operators, or vice versa, to effectuate the purpose of the Act, that is, to insure that tanks are regulated and spills are cleaned up.

*Id.* at 161.

12

enacted. *See Two Rivers Terminal, L.P. v. Chevron USA, Inc.,* 96 F. Supp. 2d 432, 443 (M.D. Pa. 2000). Two other courts have held that the Tank Act does apply to remediate pollution existing on the effective date, but caused by leaks before the statute's effective date. *See Shooster v. Amoco Oil Co.,* 2001 WL 882971 (E.D. Pa. Ap. 26, 2001) (Waldman, J.); *Delaware Coca-Cola Bottling Co. v. S & W Petroleum Services, Inc.,* 894 F. Supp 862, 865 (M.D. Pa. 1995). Those courts reasoned that the pre-enactment petroleum release itself did not trigger the statute, but rather the remedial action taken to abate the now-illegal condition of the land post-enactment. *See Delaware Coca-Cola,* 894 F. Supp at 866-7; *Shooster,* 2001 WL 882971 at *3. The United States characterizes *Shooster* and *Delaware Coca-Cola* as not applying the Tank Act retroactively, but rather as holding parties liable for the polluted condition of the land at it existed at the time of enactment. Although the leak itself may have occurred pre-enactment, the polluted condition at the time of enactment puts the owner "in violation" of the Tank Act.

The United States's focus on the condition of the land rather than the leak is borne out by Pennsylvania case law. In *Creighan v. City of Pittsburgh,* the Pennsylvania Supreme Court held that a fireman disabled by tuberculosis could obtain benefits under the state the Heart and Lung Act, despite the fact that he contracted the disease before the effective date of the Act. 132 A.2d 867, 870 (Pa. 1957). The court held that awarding benefits based on illness that existed before the effective date of the Act was not a retroactive application:

> A recognition of appellee's claim does not require that we place a retroactive construction on the Act, but simply that we apply the Act to a condition which existed on the date when the Act became effective even though such condition resulted from events which occurred prior to its effective date.

*Id.* The analogy between pollution in the Tank Act and tuberculosis in *Creighan* is compelling. The petroleum, like bacteria infecting the lungs, may have leaked into the soil prior to enactment of the Tank Act; but it is the condition of *being polluted* after the effective date that triggers the Tank Act, not the initial contamination. Because of *Creighan,* I hold that it is not retroactive to apply the Tank Act to remedy petroleum contamination that may have originated in pre-enactment leaks. The Tank Act pertains to the condition of being polluted, not only to the originating leak itself.

13

C.    Definition of Underground Storage Tank "Owner" as Owning in 1984

In the second prong of its argument, AR argues that the definition of underground storage tank "owner" as one who owned on November 8, 1984 is a legislative mistake and should not be interpreted to require retroactive application of the act to parties who owned tanks in 1984.

The United States and AR agree that AR sold its interest in Point Breeze in September 1985. The Tank Act's general effective date is in August 1989. Storage Tank and Spill Prevention Act § 2105, 1989 Pa. ALS 32 (available on Lexis only). But the Tank Act also defines "owner" as "the owner of an underground storage tank holding regulated substances on or after November 8, 1984." 35 Pa. C. S. § 6021.103.

The Pennsylvania legislature has imposed strong presumption against construing statutes retroactively: "[n]o statute shall be construed to be retroactive unless clearly and manifestly so intended by the General Assembly." 1 Pa. C. S. § 1926. "[A]bsent clear language to the contrary, statutes are to be construed to operate prospectively only." *Gehris v. Commonwealth Dep't of Transp.*, 369 A.2d 1271, 1273 (Pa. 1977). However, Pennsylvania law commands that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C. S. § 1921(b).

The Tank Act defines three classes of tank owners:

(1) In the case of a storage tank *in use on the effective date* of this act, or brought into use after that date, any person who owns or has an ownership interest in a storage tank used for the storage, containment, use or dispensing of regulated substances.

(2) In the case of an aboveground storage tank *in use before the effective date of this act, but no longer in use on the effective date of this act,* any person who owned the aboveground tank, immediately before the discontinuance of its use, as well as any person who meets the definition of owner in paragraph (1).

(3) In the case of an underground storage tank, the owner of an underground storage tank holding regulated substances *on or after November 8, 1984,* and the owner of an underground storage tank at the time all regulated substances were removed when removal occurred prior to November 8, 1984.

35 Pa. C. S. § 6021.103 (emphasis added). The second and third categories, for underground and out-of-use aboveground and storage tank ownership, appear retroactive.

AR posits that some language in the Tank Act, including the definition of underground storage tank owner, was cribbed from the federal Hazardous and Solid Waste Amendments (HSWA) to RCRA. HSWA was enacted in 1984. Pub. L. No. 98-616, 98 Stat. 3221 (1984). The HSWA, like the Tank Act, uses the November 8, 1984 date to define "owner" of an

14

underground storage tank. *Compare* 42 U.S.C. § 6991(4) *with* 35 Pa. C. S. § 6021.103.  AR reasons that the Pennsylvania legislature actually intended to define "owner" as one who owned on the effective date of the Tank Act rather than on looking to the HSWA dates.  However, AR provides no further support for its theory other than the shared language between the HSWA and the Tank Act.

It seems possible that, as AR suggests, the year 1984 is an unintended artifact of the legislative drafting process.  Sometimes when legislatures make obvious drafting mistakes, courts correct them.  *See, e.g., Morgan v. Gay,* 466 F.3d 276 (3d Cir. 2006) (holding that "less" means "more" in the Class Action Fairness Act).  But correction is only warranted "in that rare instance where it is uncontested that legislative intent is at odds with the literal terms of the statute." *Id.* at 278.  Here, it cannot be so easily assumed that the Tank Act's definition of "owner" was a legislative mistake---or, more importantly, that such a mistake would be so totally incompatible with the Tank Act as to justify ignoring the express language of the statute.

A rational legislature might chose to make newly enacted environmental regulations retroactive so that property owners do not attempt to evade or deceptively pass on liability by divesting themselves of their land in the period between the bill's initial introduction and debate, its final approval, and its effective date.

Although the Pennsylvania legislature has imposed a strong presumption against retroactivity, "clear language" will suffice to make the statute retroactive.  *Gehris v. Commonwealth Dep't of Transp.*, 369 A.2d 1271, 1273 (Pa. 1977).  Furthermore, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit."  1 Pa. C. S. § 1921(b).  In this case, it cannot be said that the reference to 1984 is either ambiguous enough or obviously mistaken enough to justify ignoring it.  Instead, it is "clear language" requiring that the statute be applied retroactively to AR.

Finally, in *Juniata*, the Superior Court held that the Tank Act's presumption of liability may not be used against a former owner.  *Juniata Valley Bank v. Martin Oil Co.*, 736 A.2d 650, 658 (Pa. Super. 1999).  Thus, despite the fact that AR is an "owner" within the meaning of the statute, the United States may not use the presumption of liability against it.

15

V.      Clean Streams Act

A.      Background

The United States asserts that Sunoco is still discharging petroleum products into groundwater in violation of the Clean Streams Act. Cmplt. ¶ 85. It seeks an order requiring Sunoco "to comply with the Clean Streams Act and abate discharges of petroleum hydrocarbons." Cmplt. ¶ 87. In its Amended Complaint, the United States asserts that the petroleum releases are still migrating onto U.S. property. Am. Cmplt. ¶ 58.[10] Under the Clean Streams Act,

> any person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this act or any rule, regulation, order or permit issued pursuant to this act . . . against any other person alleged to be in violation of any provision of this act or any rule, regulation, order or permit issued pursuant to this act.
> 35 Pa. Stat. § 691.601(c).

B.      Duplicative Order

Sunoco argues it is already subject to a PADEP order requiring it to remediate its own releases under the Clean Streams Act.[11] Sunoco says that an order seeking abatement is duplicative and would accomplish nothing, and so it cannot go forward under *Citizens Advisory Comm. on Private Prisons, Inc., v. USDOJ*, 197 F.Supp. 2d 226, 258 (W.D. Pa. 2001). Together with PADEP's 1999 UAO ordering the United States to remediate the pollution under its property, Sunoco says the consent orders form a "seamless enforcement scheme" that should not be disturbed by this court. But according to the United States, Sunoco's 2003 COA with PADEP does not require it to limit the offsite migration of pollution into the groundwater that continues today. Thus, the order sought here would not be duplicative of any PADEP order.

---

[10] Sunoco argues that the United States relies only on these assertions in its Complaint and First Amended Complaint at the summary judgment stage. Such reliance on "mere allegations" resting only on the pleadings would violate Fed. R. Civ. Pro. 56(e) and require dismissal. However, the United States has presented allegations of fact in its summary judgment briefing sufficient to meet rule 56(e)'s requirement.

[11] According to Sunoco, it voluntarily entered into a Consent Order and Agreement (COA) with PADEP in 1993 to remediate pollution emanating from its property. After the 1993 COA expired, Sunoco entered into another COA in 2003.

Sunoco disputes this characterization of the 2003 COA. As such, whether the orders would be duplicative is a live issue of material fact, and summary judgment must be denied.

    C.    Primary Jurisdiction

    Sunoco argues that under the Pennsylvania doctrine of "primary jurisdiction," the court must defer to PADEP to decide this complex regulatory matter. Primary jurisdiction requires that a court refer a matter to an administrative agency when:

> the subject matter is within an agency's jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar, the proper procedure is for the court to refer the matter to the appropriate agency. Also weighing in the consideration should be the need for uniformity and consistency in agency policy and the legislative intent. Where, on the other hand, the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility. In such cases, it would be wasteful to employ the bifurcated procedure of referral, as no appreciable benefits would be forthcoming.

*Elkin v. Bell Telephone Co. of Pennsylvania*, 420 A.2d 371, 377 (Pa. 1980).

    Although abating pollution under the Clean Streams Act is certainly a complex regulatory matter entrusted to PADEP, the private right of action for abatement given in the Clean Streams Act acts as a serious counterweight to deferring to the agency. The CSA expressly gives parties the right to "compel compliance" with the Act in courts. 35 Pa. Stat. § 691.601(c). The legislature obviously did not intend that the administrative agency be considered so uniquely situated to adjudicate the claims that the courts must always refer matters to the agency.

    By contrast, in *Elkin* the administrative body (the Public Utilities Commission) deserved deference because it "had long been recognized as the appropriate forum for the adjudication of issues involving the reasonableness, adequacy and sufficiency of public utility services." *Id.* at 374. The *Elkin* court paid special attention to the quasi-judical nature of the agency's adjudication, noting that the administrative decision was "rendered after a full and fair evidentiary hearing and consideration of briefs and arguments of the parties." *Id.* at 375. Sunoco has not demonstrated that the PADEP order constituted a similarly formal adjudication.

    On the other hand, *Elkins* directed courts to weigh the need for uniformity in administering a statute when deciding whether to defer to an agency adjudication. In the present matter, the need for uniformity is clear: overlapping or conflicting orders from this court and

PADEP to abate the same pollution (or different pollution coming from the same source) would significantly hinder remediation. This would not serve the purpose of the Clean Streams Act.

Most importantly, however, primary jurisdiction is intertwined with the exercise of res judicata. In *Elkins*, the court prescribed a bifurcated process: the matter should first be heard before the PUC; but because the PUC could not award money damages, after the administrative adjudication the plaintiff would still have an *original* cause of action (in addition to any appeal from the PUC decision) in the courts . At that point, the court would need to use principles of res judicata to sort out which issues the PUC decision precluded, and which issues could be adjudicated originally in the court. *Elkins*, 420 A.2d at 376-77. Because I have denied the earlier motion on res judicata defenses and invited the parties to refile at a later point in the litigation after discovery, I will also deny Sunoco's motion on primary jurisdiction with leave to refile along with its res judicata defense.

VI.    Declaratory Judgment Act

Sunoco and AR's motions to dismiss the DJA claims are denied because the underlying substantive claims under the Tank Act and Clean Streams Act may go forward and provide declaratory relief.

VII.    AR's Motion to Strike Demand for Jury Trial

AR's Motion to Strike Demand for Jury Trial is denied without prejudice to renew before trial.

ANITA B. BRODY, J.[12]

---

[12] This Opinion accompanies the July 23, 2007 Order denying the motions (docket entry # 108), a copy of which is attached.

18

Copies **VIA ECF** on _____ to:        Copies **MAILED** on \_\_\_\_\_ to:

19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | |
|  | ) | |
| SUNOCO, INC., et al., | ) | Civil Action No. 05-6336-ABB |
|  | ) | |
| Defendants. | ) | |
|  | ) | |
|  | ) | |
|  | ) | |
|  | ) | |

## ORDER

This __19[th]___ day of __July____, 2007, **IT IS ORDERED**:

Defendant Sunoco's Motion for Summary Judgment (docket entry # 50) is DENIED consistent with the forthcoming opinion.

Defendant Atlantic Richfield's Motion for Summary Judgment (docket entry # 56) is DENIED consistent with the forthcoming opinion.[1]

Defendant Atlantic Richfield's Motion to Strike Jury Trial Demand (docket entry # 56) is DENIED consistent with the forthcoming opinion.

---

[1] Portions of this Motion were previously granted in part and denied in part in my June 29, 2007 Order on Statutes of Limitations (docket entry # 107).

Plaintiff United States's Motion for Partial Summary Judgment on Successorship (docket entry # 58) is DENIED consistent with the forthcoming opinion.

An opinion will be forthcoming.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:            Copies **MAILED** on _____ to: