## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | )   Civil Action No. 05-6336-ABB |
| | ) |
| v. | ) |
| | ) |
| SUNOCO, INC., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

### MEMORANDUM

July **15** , 2009                                                              **Anita B. Brody, J.**

### I.  Introduction

The United States has filed suit against defendants Atlantic Richfield Company, et al.

("AR") and Sunoco, Inc. et al.  ("Sunoco") under the Pennsylvania Storage Tank and Spill

Prevention Act, 35 Pa. C. S. § 6021.101, *et seq.,* ("Tank Act"),[1] the Pennsylvania Uniform

Contribution Among Tortfeasors Act, 42 Pa. C. S. §§ 8321-8327 ("UCATA"), and the federal

Declaratory Judgment Act, 28 U.S.C. § 2201(a).  The United States also makes a claim against

Sunoco under the Clean Streams Act, 35 Pa. Stat. § 691.401 ("CSA").  In this opinion, I address:

- Document #200:  The United States' Motion for Summary Judgment on the Statute of
  Limitations Defenses

- Document #202:  Sunoco's Motion for Summary Judgment on the Statute of Limitations,
  Causation, the Clean Streams Act Claim, and Sunoco's Tank Act Counterclaim

- Document # 204:  Atlantic Richfield's Motion for Summary Judgment on the Statute of
  Limitations

---

[1]  I previously held that the United States is barred from asserting both of its Tank Act claims
against AR (Doc. #107).

The suit concerns petroleum pollution ("the Plume") allegedly emanating from a section of a South Philadelphia refinery known as the Point Breeze Processing Area ("Point Breeze"). ¶ 8.[2]   Point Breeze is currently owned by defendant Sunoco (formerly "Sun Company," or "Sun") and was previously owned by defendant AR.   ¶ 4, ¶ 9.   The Plume allegedly migrated underground from Point Breeze and contaminated a nearby United States property called the Defense Supply Center Philadelphia ("DSCP property").   ¶ 11-14; 17-44.  Pollution is allegedly still migrating from Point Breeze to the DSCP property.   ¶ 47.

The United States detected the Plume in 1987 on the DSCP property and notified the predecessor agency of the Pennsylvania Department of Environmental Protection ("PADEP") of violations of state environmental regulations.   ¶ 17.  The United States first thought that the Plume came from a leaking fuel line of its own, but as early as March 31, 1988, The United States suspected that the Plume may have originated from an off-site source. (Pl.'s Opp. to Defts.' Mot's  for Summ. J. Ex. 13).  "In 1993, Sun Co., Inc.  (R&M) and PaDEP entered into a Consent Order and Agreement ('1993 COA'), which required Sunoco to . . . address all potential off-site migration of contaminants."  (Sunoco Mot.  for Summ.  J.  ¶62).  When the 1993 COA expired in 2003, the parties renewed the Consent Order and Agreement (the "2003 COA").  (Id. at ¶63).  Under the 2003 COA, Sunoco is operating recovery and monitoring wells to ensure that no off-site migration is occurring.[3] (Id.  at ¶66).

In 1995, Kemron-Versar, two independent contractors working together, investigated the source of the Plume and issued a Final Phase I Remedial Investigation/Feasibility Study for the Defense Personal Support Center, Philadelphia ("Kemron Study,") which said that "the single

---

[2] All citations in this section are to the original Complaint unless otherwise noted.

[3] The United States disputes that the 2003 COA requires Sunoco to prevent migration from the Plume and disputes that the wells currently in place are effectively preventing migration.  (Pl.'s Opp.  to Defs.' Mots.  for Summ.  J.,  33).

most likely potential source of the 54-acre free product plume at the DPSC is the Sun Oil

Company refinery south yard. . . ." (Pl.'s Opp. Ex. 24, at v).

In 1996, the United States and Sunoco entered into a Consent Order and Agreement (the

"1996 COA") with PADEP to remediate the Plume together.  ¶ 31.  The 1996 COA is no longer

in effect.  ¶ 40.  On December 10, 1999, following two years of arbitration, PADEP issued a

Unilateral Administrative Order ("1999 UAO") requiring the United States to assume

responsibility for the remediation.  ¶ 40.  The UAO was appealed by the United States to the

Pennsylvania Environmental Hearing Board (EHB), which upheld the agency action. Id.  The

United States also sought review of the UAO in the Pennsylvania Commonwealth Court and the

Eastern District of Pennsylvania.  ¶ 42.  Those matters settled with an agreement that the United

States and PADEP would resolve future disagreements about the site through mutually agreeable

dispute resolution.  ¶ 42.  Pursuant to the UAO, the United States has been remediating the

Plume and anticipates that future remediation will be required.  ¶ 43-44.   It has already spent

$22,000,000 on remediation.  ¶ 75.

On January 26, 1996, the United States and  Sunoco (then Sun Company, Inc.) entered

into a tolling agreement (the "tolling agreement") regarding claims by the United States against

Sunoco "associated with the presence, removal or remediation of any hydrocarbon

contamination under the DPSC Facility." (Pl.'s Mot. for Partial Summ. J. Ex. 1, "tolling

agreement" 1-2).  This agreement tolled "[a]ll statute of limitations defenses, and any and all

time-related defenses." (Id. at 2).  The parties agreed that either party may terminate the tolling

agreement by delivering a written notice of its intent to terminate through certified mail.  The

United States mailed a written notice of intent to terminate on September 9, 2005, and the tolling

agreement was terminated on December 8, 2005.  This case was filed on December 8, 2005.

## II. Summary Judgment Standard

Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are material if they might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue exists when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id. at 248-52.

Summary judgment is appropriate as a matter of law when the non-moving party has failed to make an adequate showing on an essential element of his case, as to which he has the burden of proof at trial. Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999). To overcome a summary judgment motion, a plaintiff may not rely on allegations or denials; a plaintiff must set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e).

## III. Discussion

## A. United States' and Sunoco's Cross-Motions for Summary Judgment on the Tank Act Statute of Limitations[4]

I previously held that the United States' Tank Act claim for costs of abatement is subject to a six year statute of limitations and the United States' Tank Act claim for diminution of property value is subject to a three year statute of limitations.[5] (Doc. #107). The United States takes the position that neither of these claims accrued until October 26, 1993, when the Pennsylvania Superior Court interpreted the Tank Act to include a private right of action for cost

_____

[4] Except as noted, the parties generally agree on the facts relevant to the Tank Act Statute of Limitations.

[5] The United States initially only brought a claim under the Tank Act for costs of abatement (¶78 of the original complaint) but then added a claim under the Tank Act for diminution in property value in their First Amended Complaint (¶89 of First Amended Complaint).

4

recovery and damages for diminution in property value. (Pl's Mot. for Summ. J., 19).[6]  Sunoco

contends, however, that the Tank Act claims accrued when the United States knew the "essence

of the right of action."  (Sunoco Mot.  for Summ.  J., 33 (quoting United States v. Kass, 740 F.2d

1493, 1497 (11th Cir. 1984)).  Sunoco further contends that under the "essence of the right of

action" doctrine, the United States violated the statute of limitations.

     Under the general federal statute of limitations I previously held to apply, the statute of

limitations for the Tank Act begins to run "after the right of action accrues." 28 U.S.C. § 2415.  I

previously stated that "Pennsylvania law provides the rule of decision for determining the

substantive entitlements of the Tank Act, [but] federal law determines the manner in which the

federal statute of limitations applies."  (Doc. #107, fn. 5).

     A cause of action accrues when "it comes into existence." U.S. v. Lindsay, 346 U.S. 568,

569 (1954).  A cause of action has been interpreted to come into existence "when all events

necessary to state a claim have occurred.[7]" Chevron U.S.A., Inc. v. United States, 923 F.2d 830,

834 (Fed.Cir. 1991).  A claim deriving from a statute cannot accrue before the statute has been

---

[6]  As explained below, the Superior Court interpreted the Tank Act to include a private right of action for corrective action, which includes costs of abatement, but it was the Pennsylvania Supreme Court on May 16, 1995, that held that the Tank Act provides a private cause of action for diminution in property value.

[7] Sunoco alleges that my previous opinion establishes that the "right of action accrued when 'the United States first knew it was going to pay some money to clean up the defendants' pollution.'" (Sunoco's Opp. to Pl.'s Mot. for Summ. J. at 3) (citing Doc. # 107 at 22).  However, Sunoco misstates my earlier opinion, which explained that,  "[f]or tolling purposes in this case, the 'fact[] material to the right of action' is the date the United States first knew it was going to pay some amount of money to clean up defendants' pollution, not when it knew its total costs." (Doc. #107 at 22) (emphasis added).  The "fact material to the right of action" did occur when the United States first knew it was going to pay some amount of money, but as the following discussion explains, a cause of action does not necessarily accrue as soon as the fact material to the right of action occurs.  Sunoco further argues that "under federal law governing statutes of limitations, a cause of action accrues when all events necessary to state a claim have occurred." (Sunoco Opp.  at 6) (quoting Phillips Petroleum Co.  v. Lujan, 4 F.3d 858, 861 (10th Cir. 1993)). This is correct, unless, as explained below, the cause of action does not yet have a recognized legal form.

enacted.  In re Penn. Cent. Transp. Co., 944 F.2d 164, 168 (3d Cir. 1991) ("Paoli Yard").[8]  The

earliest possible date that the United States' Tank Act claims against Sunoco could accrue was

the date the Tank Act was enacted, August 5, 1989.

In 1989, when the Tank Act was enacted, it contained an express private right of action to

'compel compliance' with the Act, but this phrase was not defined in the text of the statute, nor

had any court interpreted its meaning.  Centolanza v. Lehigh Valley Dairies, Inc., 658 A.2d 336,

340 (Pa. 1995) ("Centolanza II").  On September 28, 1992, the Court of Common Pleas, Lehigh

County, held that no private right of action existed under the Tank Act.[9]  Centolanza v. Lehigh

Valley Dairies, Inc., 635 A.2d 143, 148 fn.3, fn. 4 (Pa. Super. Ct. 1993) ("Centolanza I").  On

October 26, 1993,  the Pennsylvania Superior Court reversed the trial court and held that the

Tank Act provides a private right of action to compel compliance, which necessarily includes

forcing corrective action to be taken, taking corrective action, and obtaining the costs of

abatement.  Centolanza I, 635 A.2d at 147-49.  The Superior Court stated:

> Compliance with the act includes, but is not limited to,
> compelling owners and operators to register their tanks, §
> 6021.503 . . . take corrective action after an order of DER,  §
> 6021.1302; pay costs of abatement to DER or authorized third
> parties to do so,  § 6021.1302(b) . . .

Id. at 147-48

The Superior Court did not address whether a plaintiff could recover damages for

diminution in property value under the Tank Act.  On appeal of that decision, in May 1995, the

---

[8] Sunoco argues that Paoli Yard conflicts with Lindsay because in Lindsay the court held that the claim accrued before the statute was amended to add a statute of limitations.  In Lindsay, the cause of action existed prior to and was unchanged by the amendment.  In Paoli Yard, however, because the statute at issue created a new cause of action that did not exist prior to its enactment, the court held that the claim did not accrue until the statute was enacted.  Similarly, the Tank Act created a cause of action that did not exist prior to its enactment.

[9] The Court of Common Pleas' opinion is unavailable, but the Superior Court's opinion indicates that the trial court found that the Tank Act did not provide a private cause of action.

Pennsylvania Supreme Court highlighted the Tank Act's lack of clarity as to what type of recovery a private party could seek:

> It is not clear from the statute whether a private party may obtain costs of abating a nuisance from a storage tank owner in private actions under the STSPA [the Tank Act].  The statute indicates that the private plaintiff may bring a civil action to 'compel compliance' with the STSPA.  The phrase compel compliance is not defined in the definitional section of the STSPA.

Centolanza II, 658 A.2d at 340.

Because of this ambiguous language and because the legislative intent behind the Tank Act was unclear, the Pennsylvania Supreme Court liberally construed the Tank Act and held that it provided a private cause of action for both cleanup costs and diminution in property value.  Id.

Generally, as explained above, a claim accrues when all events needed to state a claim have occurred, including the enactment of the statute that creates the cause of action.  However, the Third Circuit has explained that if the cause of action asserted was created by a statute but was not fully formed until it was judicially interpreted, the claim does not accrue until that particular cause of action is legally recognized.  The Third Circuit held that a plaintiff's claim did not accrue until a court first recognized an implied private right of action under CERCLA.  In re Reading Co., (115 F.3d 1111, 1123 (3d Cir. 1997), *questioned on other grounds in* E.I. Dupont De Nemours & Co.  v. U.S., 508 F.3d 126 (3d Cir.  2007).  The Reading court found that to hold otherwise would lead to a "harsh result" because it would sanction a party for failing to register a claim that had "no recognized legal form."  Id.  That court held as such despite the same opposing argument presented by the parties here, that the right of action was actually created when CERCLA was enacted:

> Moreover, although we could interpret §107(a)(4)(B)'s private right of action as emerging fully formed with the passage of CERCLA, the court did not for several years interpret §107(a) as

> containing such a cause of action.   If we accepted Reading's
> position we would penalize Conrail for failing to register a claim
> which would not be judicially recognized for two years.

Id.[10]

The Third Circuit expressed particular sensitivity against sanctioning a party for failing to allege

a claim that has "no recognized legal form."  Id.  While a statute itself technically may create a

cause of action, it is not "fully formed" upon enactment if the judicial interpretation significantly

expands the cause of action.  Id.

Here, the language of the Tank Act included an express right of action to "compel

compliance" with the act.  Centolanza II, 658 A.2d at 340.  It was not until six years after the

Tank Act's enactment that the Pennsylvania Supreme Court interpreted this language to

specifically include a private right of action for diminution in property value.   The phrase

"compel compliance" suggests a manner of recovery that is markedly different from the damages

for diminution in property value sought by the United States.  A claim for diminution of property

value under the Tank Act had no recognized legal form prior to the Pennsylvania Supreme

Court's decision.  To penalize the United States for failing to bring a claim that was not fully

formed until it was judicially recognized would be, in the words of the Third Circuit, unduly

---

[10]   Sunoco argues that Reading and Paoli Yard are not applicable to this case because they are
bankruptcy cases arising under CERCLA and because CERCLA created new legal relationships,
while the Tank Act merely codified previously existing nuisance and restitution actions.  (Pl.'s
Opp. 10-14).   First, while Reading and Paoli Yard concerned CERCLA claims, the respective
courts' determination of when an action accrues was discussed generally and not limited to
bankruptcy claims.  See Reading, 115 F.3d at 1123 ("To determine whether a claim existed, we
look to the substantive area of law governing the underlying claim.")  Second, the Tank Act did
not merely codify existing nuisance laws because under Pennsylvania law a nuisance action and
a Tank Act claim have different elements.  For example, a plaintiff bringing a nuisance claim has
the burden of proving causation.  Pottstown Indus. Complex v. P.T.I. Servs., Inc., No.  91-5660,
1992 WL 50084 at *8 (E.D.Pa.  March 10, 1992).  Under the Tank Act, however, there is a
presumption of liability against the tank owner.  35 P.S. §6021-1311(a).  Sunoco disputes that
the presumption of liability applies in this case, but nonetheless, the presumption of liability
distinguishes the United States' Tank Act claim from a public nuisance claim.

"harsh."[11]  Reading, 115 F.3d at 1123.  Therefore, the statute of limitations on the United States'

Tank Act claim for diminution in property value began running no earlier than May 16, 1995,

when the Centolanza II decision was filed.

      On the other hand, a private right of action for costs of abatement under the Tank Act had

a recognized legal form upon enactment of the statute because this was contained within the

statute, as noted by the Superior Court.  The Tank Act includes an express private right of action

to compel compliance with the act and in other sections the act itself describes what compliance

entails, including costs of abatement.  Lack of precision in the text of the statute is not sufficient

to delay the accrual of a right of action until a clarifying judicial decision is made.  Reading's

logic is limited to situations where the judicial interpretation of a statute's right of action is so

liberal that a reasonable litigant would not have predicted such an interpretation.  Therefore, the

statute of limitations on the United States' Tank Act claim for costs of abatement accrued on the

date of enactment of the Tank Act, August 5, 1989.

      For the above stated reasons, I find that the United States' diminution in property value

claim under the Tank Act accrued, at the earliest, on May 16, 1995, when the Pennsylvania

Supreme Court gave this claim a recognized legal form.  I also find that the United States' cost

abatement claim under the Tank Act accrued, at the earliest, on August 5, 1989, when the Tank

Act's enactment gave this claim a recognized legal form.  The United States and Sunoco agree

that "the 1996 Tolling Agreement toll[ed] all potential claims among the parties relating to the

---

[11] Sunoco points out that the Tank Act contains an express private right of action, whereas CERCLA's was merely implied.  Just as parties could not obtain contribution under CERCLA prior to a court's recognition of an implied right of action, parties could only bring an action to "compel compliance" under the Tank Act until the court expanded this recovery to include damages.  The Reading court points out that though they could interpret a private right of action as emerging when CERCLA was enacted, the court's recognition of this right of action was a "judicially-created expansion . . . [which became] the sole means by which parties could obtain contribution."  115 F.3d at 1119.  This is directly analogous to the Centolanza II court's judicial expansion of the Tank Act's private right of action to include damages, which prior to that decision was not an available type of recovery.

DSCP Plume."[12]  (Pl.'s Mot. Summ. J. ¶48.)  Sunoco does not dispute that for the purposes of

calculating the statute of limitations the tolling agreement would toll all claims that had not

expired as of January 26, 1996.  The United States' Tank Act diminution in property value claim

accrued within three years of the tolling agreement, and the lawsuit commenced when the

agreement was terminated.  Therefore, the United States' Tank Act claim for diminution in

property value against Sunoco is not barred by the statute of limitations.

The United States' claim for costs of abatement under the Tank Act did not accrue within

six years of the Tolling Agreement.  The statute of limitations, however, is tolled for the amount

of time "facts material to the right of action are not known and reasonably could not be known

by an official of the United States charged with the responsibility to act." 28 U.S.C. § 2416(c).

Under 2416(c), the "facts material to the right of action" are known when the underlying injury

is known, not when the full extent of the retrospective and prospective relief can be measured.

In this case, I previously decided that the "fact[] material to the right of action" is the date the

United States first knew it was going to pay some amount of money to clean up the defendants'

pollution, not when it knew its total costs. (Doc. #107).  Sunoco alleges that the United States

knew about the Plume, suspected nearby refineries of causing the Plume, and spent money

remediating the Plume before 1990.  (Sun. Mot. for Summ. J. at 38).  The United States responds

that they did not and should not have known that the Plume was not of their creation until 1992

and that before 1990 the United States was merely investigating the source of the Plume and not

engaged in any remediation of the Plume.  (Pl. Opp. at 58-62).  Although the United States'

---

[12] Sunoco argues in a footnote that the Tolling Agreement only applies to Sun Company, Inc. and not to the other Sunoco defendants.  (Sunoco Mot. for Summ. J. at 2, fn7).  The United States responds that Sunoco, Inc. is the successor by name change to Sun Company, that the Tolling Agreement states that the Point Breeze Refinery is owned by Sun Company, and that Atlantic Refining and Marketing Corp. is a Sunoco subsidiary and therefore subject to the Tolling Agreement.  (Pl.'s Opp. at 44).  Since Sunoco has not sufficiently briefed this issue, I cannot find that the Tolling Agreement applies only to Sun Company, Inc.

claim for costs of abatement accrued more than six years prior to the tolling agreement, summary judgment on the statute of limitations defense of this claim is nonetheless inappropriate because there is a genuine issue of material fact as to when the United States first knew it was going to pay some amount of money to clean up the defendants' pollution, a fact which tolls the statute of limitations.

### Summary of Material Dates:

| EVENT | DATE |
|---|---|
| Tank Act enactment | August 5, 1989 |
| Centolanza I:  Superior Court decision explaining that under the language of the Tank Act, a private action to compel compliance includes seeking costs of abatement | October 26, 1993 |
| Centolanza II:  Supreme Court decision interpreting the Tank Act to include a private right of action for diminution in property value | May 16, 1995 |
| Tolling Agreement between the US and Sunoco enacted | January 26, 1996 |
| Tolling Agreement terminated | December 8, 2005 |
| United States brought suit | December 8, 2005 |

| | |
|---|---|
| Statute of limitations for costs of abatement claim under the Tank Act | 6 years |
| Statute of limitations for diminution in property value under the Tank Act | 3 years |

## B.  Sunoco's Motion to Strike the United States' Jury Demand

Sunoco asks the Court to strike the United States' jury demand on the basis that the claim for diminution in property value under the Tank Act (the only claim Sunoco alleges entitles the United States to a jury trial) is barred by the statute of limitations.  This request is denied as the United States' Tank Act claim for diminution in property value is not barred by the statute of limitations.

11

**C.  Sunoco's, AR's, and the United States' Cross-Motions for Summary Judgment under the Pennsylvania Uniform Contribution Among Tortfeasors Act ("UCATA") Statute of Limitations**

I previously held that the United States' UCATA claim is subject to a six year statute of limitations.  (Doc. #107).  The United States claims that this statute of limitations accrued, at the earliest, with the 1999 Unilateral Administrative Order ("UAO").  Sunoco responds that the United States' UCATA claim accrued either at the time the United States first discovered and investigated the Plume, or alternatively when the Tank Act was enacted.  AR joins Sunoco's arguments and further contends that the United States' UCATA claim must have accrued before the 1999 UAO because the United States had already spent money remediating the Plume in excess of their alleged pro rata share and because the United States was under a legal obligation to clean up the Plume before the 1999 UAO.

As previously stated, federal law determines the manner in which the federal statute of limitations applies, but state law governs the substantive elements of a state statute. (Doc. #107 at 7, fn.5).  Under federal law, the statute of limitations for a UCATA claim begins to run "after the right of action accrues."  28 U.S.C. § 2415.  A cause of action accrues when "it comes into existence."  United States v. Lindsay, 346 U.S. 568, 569 (1954).  A cause of action comes into existence when all the elements of the claim have occurred.  Chevron U.S.A., Inc. v. United States, 923 F.2d 830, 834 (Fed. Cir. 1991).  We must look to state law to define the particular elements of a UCATA claim because UCATA is a state statute.  See Smith v. Whitmore, 270 F.2d 741, 744 (3d Cir. 1959) (holding that the conditions imposed as to the accrual of a right to a money judgment for contribution is a matter of substantive law.)

A joint tortfeasor's right to contribution is distinct from the underlying action.  Nat'l Mut. Cas. Ins. Co. v. Nicholson Constr. Co., 542 A.2d 123, 126 (Pa. Super. Ct. 1988).  The

rights of a contribution action "flow not from the tort, but from the judgment or settlement itself." Oviatt v. Automated Entrace System Co., 583 A.2d 1223, 1227 (Pa. Super. Ct. 1990) (citations omitted).  Because of this distinction, the statute of limitations on a contribution action does not begin until the necessary elements of the contribution claim are present.[13]  Nat'l Mut. 542 A.2d at 126.

Two conditions must exist before the right of contribution arises under UCATA: 1) one joint tortfeasor has discharged the common liability or paid more than his pro rata share, and 2) the liability of the other joint tortfeasors to the original plaintiff has been extinguished.  Oviatt, 583 A.2d at 1226 (citing Swartz v. Sunderland, 169 A.2d 289, 291 (Pa. 1961)).[14]  The right of contribution may be sought in the original action via joinder, or in a later action by an original defendant who was found liable to the original plaintiff.  Oviatt, 583 A.2d at 1226. Extinguishment of the liability of the joint tortfeasors can be achieved through a judgment in favor of the original plaintiff or a settlement that explicitly releases the other joint tortfeasors from liability.  Oviatt, 583 A.2d at 1225-26; see also Swartz, 169 A.2d at 290-91 (permitting the original defendant to seek contribution from an additional defendant after the original defendant settled with the plaintiff, by securing a release of all claims against the original and additional defendants).  The original defendant cannot bring a separate contribution claim until the joint tortfeasors liability to the original plaintiff is extinguished.  See Kovalesky v. Giant Rug Market, 618 A.2d 1044 (Pa. Super. Ct. 1993) (holding that the appellant was not entitled to contribution

---

[13]Both AR and Sunoco contend that the UCATA claim arises either at the time of the injury or upon the enactment of the Tank Act, the underlying tort to the United States' contribution claim. (Sunoco Mot. for Summ. J. at 50 and AR Opp. at 3).  The United States' UCATA claim could not accrue, however, until the necessary elements of a contribution claim, discussed below, are present.

[14]Swartz was written before the current UCATA was enacted, however, that case deals with the legislative predecessors to the current act, and the language used in sections one and two of the old UCATA is virtually identical to sections 8322 and 8324 of the current UCATA. Oviatt, 583 A.2d at 1225-26.

because the appellant signed a settlement that did not extinguish the appellees' liability.)  "A

person seeking contribution must extinguish the liability of the person against whom

contribution is sought for that portion of liability, either by settlement with the plaintiff or by

satisfaction of judgment."  Restatement (Third) of Torts, § 23 cmt.  B.

Sunoco and AR assert that once the United States paid more that its pro rate share of

remediating the Plume, the UCATA claim accrued.  (AR's Mot. for Summ. J. at 26 and

Sunoco's Mot. for Summ. J. at 53-54).  In support of this, they cite the UCATA statute: "a joint

tort-feasor is not entitled to a money judgment for contribution until he has by payment

discharged the common liability *or* has paid more than his pro rata share thereof." 42 Pa. Con.

Stat. Ann. § 8324(b) (emphasis added).  While payment is a prerequisite to a money judgment

for contribution, the case law cited above makes it clear that the party seeking contribution must

also extinguish the liability of the other joint tortfeasors to the injured party in order to bring a

separate contribution claim.  In this case, there is no judicial judgment or settlement that

extinguished AR and Sunoco's liability to PADEP for remediation of the Plume.  However, the

1999 UAO ordered the United States to remediate the Plume and governs the United States'

obligations that are relevant to the UCATA claim.  No events prior to the 1999 UAO

extinguished Sunoco and AR's liability to PADEP to remediate the Plume.[15]  As I stated

---

[15] AR maintains that other orders and laws passed prior to the 1999 UAO obligated the United
States to remediate the plume and therefore extinguished AR's liability.  (AR's Mot. for Summ.
J. at 20-25).  AR states that Executive Order 12088, requiring federal agencies to comply with
state environmental law, in conjunction with the Tank Act and Clean Streams, and BRAC, a
statute governing base closure and realignment, both obligated the United States to remediate the
Plume.  Both BRAC and Executive Order 12088 were general requirements and were not
specifically directed at the United States.  AR does not sufficiently explain how these obligations
extinguished the liability of AR and Sunoco.  AR also claims that the 1996 COA caused the
United States' UCATA claim to accrue.  The 1996 COA, however, is no longer in effect.  Since
the 1996 COA is no longer in force, it cannot possibly have extinguished the liability of AR.

Previously, AR argued that the United States could not bring a UCATA claim because AR's
liability to the injured person was not explicitly extinguished by the 1996 COA (Doc. # 56, 45-
47).  I held that because the 1996 COA does not govern the United States' current obligations to
remediate the Plume, that it was not relevant to the UCATA claim.  I was not asked to consider,

14

previously, "the United States' current obligations are governed by the 1999 UAO.  These current obligations, not the past agreement, are relevant to the present UCATA claim." (Doc. #117 at 7).  Therefore, the United States UCATA claims did not accrue, at the earliest, until December 10, 1999,  and under the six year statute of limitations I previously found to apply, did not expire prior to the United States bringing suit on December 8, 2005.

### D.  Sunoco's Motion for Summary Judgment on Causation

Sunoco contends that the United States cannot meet its burden of proving causation under the Tank Act or UCATA because all of the alleged pollution migration from Point Breeze occurred prior to 1952, more than 30 years before Sunoco purchased the refinery.  According to Sunoco, the portion of the Plume that the United States alleges comes from the refinery is made of "thermally-cracked" material, and thermal-cracking is an outdated refinery process that ceased in the early 1950s.  (Sunoco Mot. for Summ.  J.,  8-9).  A process called "fluid catalytic cracking," which produces certain types of molecules called paraffins, replaced thermal-cracking.  (Id.,  9).  Sunoco further claims that the type of paraffins in the Plume demonstrates that the Plume could not have been produced by fluid catalytic cracking.  (Id.).  As the United States points out, along with disputing many of the facts presented by Sunoco, determining the cause of the contamination and the chemical composition of the Plume is a highly technical process that requires expert analysis.  Though fact discovery is now closed, the expert phase of discovery has not commenced in this case and genuine issues of material fact exist as to causation. Therefore, I will deny Sunoco's Motion for Summary Judgment on causation without prejudice to renew after expert reports have been filed.

however, whether or not the 1999 UAO extinguished AR and Sunoco's liability to PADEP by ordering the United States to bear the costs of remediation, and therefore could give rise to the United States' UCATA claim.  If Sunoco or AR take the position that the 1999 UAO did not extinguish their liability to PADEP, I will allow them to file motions on that issue on or before August 14, 2009.

Additionally, the Tank Act contains a presumption of liability against any "person who owns or operates an aboveground or underground storage tank" that alleviates the need for a plaintiff to prove causation.  35 P.S. § 6021.1311(a).  Sunoco asks the Court to determine that the Tank Act presumption of liability does not apply to the United States claim and that therefore the United States has the burden of proving causation.   Sunoco states that in order for the Tank Act's presumption of liability to apply to the United States' claim, Sunoco must have stored the substance found in the Plume.  As explained above, Sunoco claims to have never used thermal-cracking when they owned the refinery and that therefore they could not have owned a storage tank that contained a substance of the type that caused the contamination.  For the reasons discussed above, at this stage in the litigation it is premature to determine whether or not Tank Act presumption of liability applies to the United States' claim based on the type of substance contained in the storage tank.

Sunoco further contends that the doctrine of res judicata bars the United States from invoking the Tank Act presumption of liability against Sunoco based on PADEP's order (the 1999 UAO) for the United States to remedy the Plume and the Environmental Hearing Board's (EHB) upholding of that order.  The United States responds that res judicata does not apply because the application of the Tank Act's presumption against Sunoco was not an issue decided in the prior adjudication.  Sunoco asserts that language from the EHB's order establishes that the issue was in fact adjudicated previously.  The language Sunoco points to discusses that PADEP's decision to issue the order against the United States alone was justified, in part because none of the plume that was required to be remediated underlies Sunoco's property, the plume on the United States' property was unrelated to the plume on Sunoco's property, and data failed to support the theory that the plume migrated from Sunoco's property.  (Sunoco Reply, 33).  This

language does not conclusively establish that PADEP or the EHB previously adjudicated whether or not the Tank Act's presumption of liability can be applied to Sunoco. Therefore, Sunoco's motion for summary judgment precluding the Tank Act's presumption of liability based on the doctrine of res judicata is denied.

**E.  Sunoco's Motion for Summary Judgment on the United States' Clean Streams Act Claim**

1. Duplicative and Interfering Relief

The United States seeks injunctive relief ordering Sunoco to "comply with the Clean Streams Act and abate discharges of petroleum hydrocarbon products from Point Breeze." (First Amended Complaint, ¶101). Sunoco renews their previous argument that the United States' claim under the CSA should be dismissed because it seeks injunctive relief that is duplicative of and would interfere with the 2003 Consent Order between Sunoco and PADEP. Sunoco argues that it is already subject to a PADEP order requiring it to remediate its own releases under the Clean Streams Act. Sunoco says that an order seeking abatement is duplicative and would accomplish nothing, and so it cannot go forward under Citizens Advisory Comm. on Private Prisons, Inc., v. USDOJ, 197 F.Supp.2d 226, 258 (W.D.Pa. 2001). The United States responds that the injunction requested differs from the 2003 COA because that agreement does not address the cleanup of contamination en route to the DSCP property, nor does it prevent any additional contamination from leaving Point Breeze. Thus, the order sought here would not be duplicative of any PADEP order. Sunoco disputes this characterization of the 2003 COA. I previously denied Sunoco's Motion for Summary Judgment on this issue because whether the orders would be duplicative was a live issue of material fact. (Doc. #117).

Sunoco argues that any complaint about the insufficiency of the 2003 COA "is a complaint about Pennsylvania law" because the 2003 COA incorporates the requirements of

Pennsylvania's Land Recycling and Environmental Remediation Standards Act ("Act 2"), 35 P.S. §6026.101 et seq.  (Sunoco's Reply, 58).  Sunoco points out that the 2003 COA is sufficient relief,  that Sunoco is doing everything they are required to do under Pennsylvania law, and that both PADEP and Sunoco recognize the risk of potential off-site migration from Point Breeze. Sunoco also emphasizes that PADEP expressed concerns about injunctive relief interfering with the 2003 COA.  Sunoco, however, does not provide sufficient evidence to show that the injunctive relief requested is duplicative of the 2003 COA or that it would interfere with the 2003 COA.  In particular, Sunoco has not demonstrated where in the 2003 COA Sunoco agreed to address the cleanup of contamination en route to the DSCP property, or prevent any additional contamination from leaving Point Breeze.  Therefore, I deny Sunoco's motion for summary judgment based on duplicative or interfering injunctive relief.

2. Primary Jurisdiction

Sunoco renews their previous argument that the Pennsylvania doctrine of "primary jurisdiction" mandates dismissal of the Clean Streams Act claim because the Court must defer to PADEP to decide this complex regulatory matter. Primary jurisdiction requires that a court refer a matter to an administrative agency when:

> the subject matter is within an agency's jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar, the proper procedure is for the court to refer the matter to the appropriate agency. Also weighing in the consideration should be the need for uniformity and consistency in agency policy and the legislative intent. Where, on the other hand, the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility. In such cases, it would be wasteful to employ the bifurcated procedure of referral, as no appreciable benefits would be forthcoming.

Elkin v. Bell Telephone Co. of Pennsylvania, 491 Pa. 123, 420 A.2d 371, 377 (1980).

Although abating pollution under the Clean Streams Act is certainly a complex regulatory matter entrusted to PADEP, the private right of action for abatement given in the Clean Streams Act acts as a serious counterweight to deferring to the agency. The CSA expressly gives parties the right to "compel compliance" with the Act in courts.  35 Pa. Stat. § 691.601(c). The legislature obviously did not intend that the administrative agency be considered so uniquely situated to adjudicate the claims that the courts must always refer matters to the agency.

By contrast, in <u>Elkin</u> the administrative body (the Public Utilities Commission) deserved deference because it "had long been recognized as the appropriate forum for the adjudication of issues involving the reasonableness, adequacy and sufficiency of public utility services." <u>Id</u>. at 374.  The <u>Elkin</u> court paid special attention to the quasi-judicial nature of the agency's adjudication, noting that the administrative decision was "rendered after a full and fair evidentiary hearing and consideration of briefs and arguments of the parties."  <u>Id.</u> at 375. Sunoco has not demonstrated that the PADEP order constituted a similarly formal adjudication.

On the other hand, <u>Elkin</u> directed courts to weigh the need for uniformity in administering a statute when deciding whether to defer to an agency adjudication.  In the present matter, the need for uniformity is clear: overlapping or conflicting orders from this court and PADEP to abate the same pollution (or different pollution coming from the same source) would significantly hinder remediation.  This would not serve the purpose of the Clean Streams Act.

Most importantly, however, primary jurisdiction is intertwined with the exercise of res judicata.  In <u>Elkin</u>, the court prescribed a bifurcated process: the matter should first be heard before the PUC; but because the PUC could not award money damages, after the administrative adjudication the plaintiff would still have an original cause of action (in addition to any appeal from the PUC decision) in the courts. At that point, the court would need to use principles of res

19

judicata to sort out which issues the PUC decision precluded, and which issues could be

adjudicated originally in the court.  Elkin, 420 A.2d at 376-77.   I previously ruled that since I

denied the United States' motion on res judicata defenses and invited the parties to refile at a

later point in the litigation after discovery, I would also deny Sunoco's motion on primary

jurisdiction with leave to refile along with its res judicata defenses.  (Doc. #117).  Sunoco has

not refiled as to any res judicata defenses, other than the res judicata issue discussed above

regarding the Tank Act presumption.  Sunoco has not sufficiently briefed which issues the

PADEP order precludes, and which issues can be adjudicated originally in this Court.  Therefore,

I deny Sunoco's motion for summary judgment based on the doctrine of primary jurisdiction.

**F.  Sunoco's Motion for Summary Judgment on Sunoco's Tank Act Counterclaim**

      Sunoco claims that the United States is liable to Sunoco under the Tank Act for costs

incurred by Sunoco in investigating and remediating the Plume pursuant to a consent order

between Sunoco, the United States and PADEP.  Sunoco contends that under the Tank Act's

presumption of liability, the United States is liable to Sunoco because contamination was found

within 2,500 feet of tanks owned by the United States.  The United States concedes that Sunoco

falls within the class of entities that can bring a private right of action for cost recovery under the

Tank Act, and that the United States is strictly liable under the Tank Act for remediating the

Plume.  (United States' Response to Sunoco's Summ. J.,  118).  The United States responds,

however, that the Court should deny Sunoco's summary judgment motion on their Tank Act

counterclaim because 1) the statute of limitations has run; 2) Sunoco has not met its prima facie

burden of proving that it incurred costs related to the Plume; 3) the United States is not jointly

and severally liable to Sunoco such that it must pay all of Sunoco's costs regardless of Sunoco or

AR's contribution to the Plume; and 4) even if the United States is liable to Sunoco, the Court

should stay payment until determining whether Sunoco and/or AR are liable to the United States. The United States also claims that Sunoco is not entitled to fees and costs because the United States has not waived its immunity to fees and costs under state law.

First, the United States claims that because a claim for cost recovery under the Tank Act is a claim for restitution under a contract implied in law, Pennsylvania's four-year statute of limitations should apply under 42 Pa. Con. Stat. § 5525(a). The United States fails to explain, however, why the 20-year statute of limitations prescribed by the Tank Act itself for actions seeking civil penalties would not apply to Sunoco's counterclaim for cost recovery. 35 P.S. § 6021.1314. Previously, the United States pointed out the logic of the court in FSA Group, Inc. v. Amerada Hess Corp. (Doc. #105):

> In sum, while it is objectively an undeniably indulgent length of time, a 20-year statute of limitations for all actions--including private actions--brought pursuant to the STSPA better serves the statute's stated remedial goals and is consistent with the Pennsylvania courts' consistently liberal construction of the statute. Moreover, the STSPA provides no other limitations period, and for the courts to do so risks the application of multiple, disparate statutes of limitations to the various provisions of the STSPA in contravention of its remedial purposes. Such a scheme would also encourage parties to artificially configure the contours of claims or defenses based upon the desired limitations period rather than the most appropriate conduct or circumstance presented by the facts. While the Government is often afforded a long limitations period, the Pennsylvania Supreme Court has unequivocally determined that "a private action brought under the STSPA is no different than one brought by the Commonwealth." Centolanza, 658 A.2d at 341. Following that guidance, this Court, as it is virtually compelled to do, holds that the 20-year statute of limitations applies to private causes of action under the STSPA. "'[I]t is not our function to construe a state statute contrary to the construction given it by the highest court of a State.'" Memorial Hospital v. Maricopa County, 415 U.S. 250, 256, 94 S. Ct. 1076, 39 L. Ed. 2d 306 (1974) (quoting O'Brien v. Skinner, 414 U.S. 524, 94 S. Ct. 740, 38 L. Ed. 2d 702 (1974)).

No. 05-809, 2007 U.S. Dist. LEXIS 46875, *32-33 (E.D.Pa. June 28, 2007).

I previously held that the United States was subject to no statute of limitations unless it chose to impose one on itself, which it did under 28 U.S.C. § 2415.  (Doc. #107, 6).  This holding does not effect the appropriate statute of limitations to apply to Sunoco's Tank Act counterclaim. Because the United States has provided no law to the contrary, and because the FSA Group court analyzed this issue at length and with clarity, I find that Sunoco's counterclaim under the Tank Act is subject to the Tank Act's prescribed 20-year statute of limitations and is therefore not time-barred.

Second, the United States contends that Sunoco's motion for summary judgment on its counterclaim should be denied because Sunoco has not met its burden of proving its costs.  The United States claims that the evidence Sunoco presented to support its counterclaim, namely, a declaration from Steven Coldonato ("Coldonato"), is insufficient to meet Sunoco's burden of establishing a prima facie case.  Coldonato is Sunoco's environmental remediation manager.  In his declaration, Coldonato stated that under the 1996 COA, Sunoco spent $5,091,126.00 to investigate and remediate the Plume.  Coldonato subdivided this total into amounts spent in initial meetings with PADEP and the United States, investigating the Plume, undertaking sewer odor control and maintaining a Biofilter, constructing and installing the Phase I remedial system, and developing a Health Risk Assessment for the Plume.  Sunoco did not include any underlying documentation for these amounts, nor did the United States request any during discovery.  The United States maintains that they were not required to request discovery on this issue because Sunoco should have included the documentation as part of their initial disclosures under Rule 26(a)(1)(A).  In Sunoco's initial disclosures they stated that they would seek at least $4 million to recoup their expenses for investigation and remediation of the DSCP property.  Sunoco also stated that any documents related to Sunoco's costs would be made available on disk at the

United States' request.  During discovery, however, the United States did not request any of these documents.  Sunoco remains willing to provide additional documentation to support its claim for cost recovery.  I already decided to postpone a decision on summary judgment regarding causation until after the expert discovery phase to allow the United States to present evidence; therefore, I will similarly postpone a decision on Sunoco's counterclaim until they have provided the above-mentioned documentation to the United States and the United States has had an opportunity to rebut this evidence.  The United States is not only amenable to this arrangement, but agrees that the validity of a parties' costs should be left until the expert discovery stage.  (United States' Opp., 128).

Third, the United States claims that it is not jointly and severally liable for all of Sunoco's alleged costs, but instead that Sunoco is only able to recover the portion of its costs that exceeds its pro rata share of the liability.  Here, the United States attempts to characterize Sunoco's counterclaim as a claim for contribution instead of a claim for cost recovery.  This is precisely the argument that Sunoco and AR made previously.  I held that "the Tank Act gives liable parties the right to seek recovery.  Defendants may not destroy that right by recharacterizing the claim as one for contribution.  Cost recovery and contribution are two distinct remedies available to liable parties."  (Doc.  117, 9).  Therefore, Sunoco may seek recovery for all of its alleged costs under the Tank Act.  I agree with the United States, however, that even if summary judgment were to be granted on Sunoco's counterclaim, it would be premature to order payment before Sunoco's liability to the United States has been determined.

Lastly, the United States claims that Sunoco should not be awarded attorneys' fees and costs because the United States has not waived sovereign immunity as to attorneys' fees and expenses under state statutes.  The Tank Act gives a court discretion to award litigation costs,

23

including attorneys' fees, to any party.  35 Pa. Stat. Ann. § 6021.1305(f).  The United States

points out that they have not waived sovereign immunity as to attorneys' fees and costs under

state statutes, only under federal statutes and federal common law.  The United States does not

address, however, the express waiver contained in 42 U.S.C. § 6991f.  That statute states that the

United States:

> shall be subject to, and comply with, all Federal, State, interstate,
> and local requirements, both substantive and procedural . . .
> respecting underground storage tanks in the same manner, and to
> the same extent, as any person is subject to such requirements . . . .
> The United States hereby expressly waives any immunity otherwise
> applicable to the United States with respect to any such substantive
> or procedural requirement.

42 U.S.C. § 6991f.

Though the United States explains that there is no general waiver of immunity as to attorneys'

fees under state statutes, they do not address the express waiver in 42 U.S.C. § 6991f.  This

express waiver establishes that the United States is subject to the same substantive and

procedural requirements as any person under state laws regulating underground storage tanks.

Therefore, Sunoco may seek attorneys' fees and costs under their Tank Act counterclaim.

s/Antia B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:        Copies **MAILED** on _____ to: